JUNIUS S. MORGAN et al., as Trustees, and LEONHARD A. KEYES et al., as Surviving Executors of HERBERT L. SATTERLEE, Deceased Trustee, under a Declaration of Trust Made by J. PIERPONT MORGAN, Deceased, for the Benefit of LOUISA P. SATTERLEE, Deceased, Plaintiffs, *v.* LEONHARD A. KEYES, as Surviving Executor of LOUISA P. SATTERLEE, Deceased, et al., Defendants.

Supreme Court, Special Term, New York County, June 21, 1950.

*Lawrence D. Kieran* for plaintiffs.

*J. Fearon Brown* and *James H. Nichols* for Leonhard A. Keyes, as executor and trustee under the will of Louisa P. Satterlee, deceased, defendant.

*Robert Thrun* and *Martin D. Jacobs* for Mabel S. Ingalls, defendant.

*Sol A. Rosenblatt* and *Charles Roden* for Eleanor M. Satterlee, defendant.

*John F. Keating,* guardian ad litem of Sandra S. Ingalls, defendant.

BENVENGA, J. This is an action for a judgment settling the final accounts of the plaintiffs as trustees under a declaration of trust made by J. Pierpont Morgan. No issue is raised as respects the accounts themselves. The only question presented involves

the disposition of the trust fund. The problem requires a judicial construction of (1) the trust instrument; (2) the last will and testament of Mr. Morgan, and (3) the last will and testament of Louisa P. Satterlee, the beneficiary of the trust and a daughter of Mr. Morgan.

Mr. Morgan, the creator of the trust, died in March, 1913; Mrs. Satterlee died in October, 1946, leaving her surviving two adult daughters, the defendants Mabel S. Ingalls and Eleanor M. Satterlee (hereinafter referred to as Mabel and Eleanor). Mabel has an infant daughter, the defendant Sandra S. Ingalls (hereinafter referred to as Sandra). Eleanor has no issue.

Under the declaration of trust, executed in 1901, Mr. Morgan directed that, out of the amount standing to the credit of his account on the books of J. P. Morgan & Co., the sum of $1,000,000 (hereinafter referred to as the 1901 fund) be transferred to the account of J. Pierpont Morgan, trustee, to be held in trust for Mrs. Satterlee. During Mr. Morgan's lifetime, the fund was to remain in the business of J. P. Morgan & Co. as a loan bearing interest at the rate of 6% per annum, and interest thereon, as it accrued, was to be paid over quarterly to Mrs. Satterlee. After Mr. Morgan's death, he was to be succeeded as trustee by the persons designated in his will, who were to hold and dispose of the fund " upon the same trusts and in the same manner " as therein to be provided " in respect of the properties thereby devised and bequeathed in trust " for Mrs. Satterlee.

By article V of his will, executed in 1913 (about three months before his death), Mr. Morgan bequeathed to his trustees the sum of $3,000,000 (hereinafter referred to as the 1913 fund), to collect and receive the income thereof and pay the same over to Mrs. Satterlee during her natural life, and, upon her death, to her surviving issue, " subject, however, to the power and authority which I hereby give to my said daughter to dispose of said sum * * * by her last will and testament among her issue in such shares or proportions and on such lawful trusts as she may think proper."

Subsequently, by her will, executed in 1936, Mrs. Satterlee devised and bequeathed to her husband " *all* my property and interests in property, * * * of which I shall die possessed or of which I may have power to dispose of, *except* the property and interests in property disposed of " in Article III of her will. (Emphasis supplied.) In the event she survived her husband, Mrs. Satterlee devised and bequeathed " all the rest, residue and remainder " of her property and interests in property, except " the principal sum " as to which under article V

of her father's will, she has a " special power " of disposition among her issue, as follows: one half to Mabel outright and one half to Eleanor in trust.

Then, in article III of her will, Mrs. Satterlee referred to " the principal of a certain sum " in which she had a life interest under article V of her father's will, and directed (1) that one half of " the entire said principal sum " be paid to her trustee in trust, to collect and receive the income thereof and apply the same to the use of Mabel during her natural life, with remainder over to Mabel's issue; and (2) that the income from the other half of "the entire said principal sum " be paid to her trustee in trust, to collect and receive the income and apply the same to the use of Eleanor during her natural life, with remainder over to Mabel if living, otherwise to Mabel's surviving issue. Then follows an *in terrorem* provision, twice repeated, to the effect that if Eleanor fails to accept the provisions in her favor, or contests the validity of the will, or seeks to invalidate any of its provisions, then Eleanor is to receive the sum of $10,000 and the balance of the trust fund is to be paid over outright to Mabel if living, otherwise to Mabel's surviving issue.

1. Concededly, Mrs. Satterlee died possessed of a special testamentary power to appoint among her issue both the 1901 fund and the 1913 fund. The validity of the appointment of the 1913 fund is not challenged. The problem presented relates to the 1901 fund. Did Mrs. Satterlee intend to exercise the power to appoint the 1901 fund in her will? Did she validly exercise such power?

In determining the testator's intention, which is " all controlling " (*Matter of Morgan,* 193 Misc. 405–408), recourse must be had to the language of the will itself and to the circumstances surrounding its execution.

In the first place, Mrs. Satterlee's will must be read in the light of the fact that both funds were set up for her benefit, subject to a special testamentary power to appoint and dispose of both funds among her issue. The will is also to be read in the light of Mrs. Satterlee's expressly declared intention to dispose of " all " her estate, including both funds, by article III of her will. Hence, reading article III in the light of her intention, it would seem clear that, in directing that the income from " the entire principal sum " in which she has a life interest be applied to the use of Mabel and Eleanor, with remainders over as indicated, she intended the direction to include the principal of both funds, and intended to appoint and dispose of the principal of both funds.

It is true that article III of Mrs. Satterlee's will refers to the special power of appointment given to her under article V of her father's will, and that article V of that will merely sets up the 1913 fund. But it is equally true that the declaration of trust directs that the 1901 fund be held and disposed of '' upon the same trusts and in the same manner '' as the 1913 fund and that neither article V of Mr. Morgan's will nor article III of Mrs. Satterlee's will specifically refers to the 1901 fund. But, clearly, express reference to the 1901 fund is not essential, if it was Mrs. Satterlee's intention to appoint and dispose of the fund, and such intention appears by necessary implication. Therefore, reading Mr. Morgan's will in the light of the declaration of trust and reading Mrs. Satterlee's will in the light of both instruments, the conclusion would seem inescapable that both testators had the 1901 fund in mind in drafting their wills; that, after the 1913 fund was set up, Mrs. Satterlee considered both funds disposable under article V of her father's will, and that the reference in article III of Mrs. Satterlee's will to '' the entire principal sum '' in which she has a life interest is a reference to both funds, and evidences an intention to appoint and dispose of both funds.

The soundness of this construction seems to be suggested by section 18 of the Personal Property Law, which provides that personal property embraced in a power to bequeath passes by a will or testament purporting to pass '' all '' the personal property of the testator, '' unless the intent, that the will or testament shall not operate as an execution of the power, appears therein either expressly or by necessary implication '' (see *Lockwood* v. *Mildeberger,* 159 N. Y. 181, 186–188; *Chase Nat. Bank* v. *Central Hanover Bank,* 265 App. Div. 434, 447–448, and *Matter of Davis,* 186 Misc. 397, 401). Clearly, the intent that Mrs. Satterlee's will shall not operate as an execution of the special power of appointment vested in her does not appear therein either expressly or by necessary implication.

The argument that Mrs. Satterlee intended to pass the 1901 fund to Mabel and Eleanor outright and free from trust, by consciously and deliberately omitting to appoint it, is unconvincing. If Mrs. Satterlee had no intention to appoint and dispose of the 1901 fund, but to give one half of the fund to Eleanor outright, as counsel contend, it would have been an easy matter to have so stated and Mrs. Satterlee would undoubtedly have done so and left nothing to inference and conjecture in view of the *in terrorem* provisions. These provisions would seem to indicate that, for some reason which she deemed good and suffi-

cient, Mrs. Satterlee intended to give Eleanor only a life interest in her estate and did not intend any part of it to pass to her outright, or even to give her a power of appointment over any part of it. And, as counsel are forced to admit, in default of appointment, the 1901 fund passes to Mabel and Eleanor outright and free from trust — contrary to Mrs. Satterlee's expressed intention.

To be sure, the language of the will might have been more explicit. Nevertheless, when the various instruments are read in the light of the circumstances surrounding their execution, the construction here placed upon the will seems more reasonable and seems in accord with Mrs. Satterlee's intention. Any other construction would defeat her intention not to give Eleanor any part of her estate free from trust.

2. The question remains whether the exercise by Mrs. Satterlee of the special testamentary power to appoint the 1901 fund violates the rule against perpetuities (see Personal Property Law, § 11, and Real Property Law, §§ 42, 178). This question was left open in a prior proceeding (see Matter of Morgan, 193 Misc. 405, 407, supra).

The statute prohibits the suspension of the absolute power of alienation by any limitation or condition for a longer period than " two lives in being " at the date of the instrument containing such limitation or condition, or, if such instrument be a last will and testament, for not more than " two lives in being " at the death of the testator (Personal Property Law, § 11). And by statutory definition, the absolute power of alienation is suspended when there are " no persons in being " by whom an absolute fee in possession can be conveyed (Real Property Law § 42). It is provided, however, that, where the absolute right of alienation is suspended by " an instrument in execution of a power ", the period must be computed, not from the date of such instrument, but from the time of the creation of the power (Real Property Law, § 178). These sections of the Real Property Law, as well as all the provisions of the Real Property Law relating to powers (i.e., §§ 130–183) are equally applicable to situations involving personal property (Williams v. Montgomery, 148 N. Y. 519, 526; Matter of Moehring, 154 N. Y. 423, 427; Matter of Brenner, 169 Misc. 412, 418, affd. 256 App. Div. 1064).

Concededly, when the trust instrument was executed in 1901, Mabel was in being, but Eleanor was not. However, when Mr. Morgan executed his will in 1913, both Mabel and Eleanor were in being; so, also, when Mrs. Satterlee executed her will in 1936.

The contention is accordingly made that, assuming Mrs. Satterlee intended to exercise her special power to appoint the 1901 fund, the appointment to Mabel and Eleanor is invalid, inasmuch as Eleanor was *not* in being at the date of the trust instrument. The basis of this contention is that the trust instrument and the Morgan will are to be read together, and that as the power of alienation was suspended during the life of Eleanor (a person *not* in being when the trust instrument was executed), there has been an unlawful suspension of the power of alienation. The contention is untenable.

The declaration of trust simply created the 1901 trust for the benefit, and during the life, of Mrs. Satterlee, and directed that the trust fund be held and disposed of " upon the same trusts and in the same manner " as was to be provided in Mr. Morgan's will. The trust instrument, however, made no complete or formal disposition of the principal or remainder of the fund (*Richardson* v. *Richardson,* 298 N. Y. 135, 139–140, 141–142). Indeed, Mr. Morgan reserved to himself the right and power to appoint or dispose of it by will.

Since Mr. Morgan had the right to appoint the trust fund by his will, he clearly had the right to confer upon Mrs. Satterlee the power to appoint it. And this he did by authorizing and empowering her to appoint both the 1901 fund and the 1913 fund " among her issue ", setting no limitation or condition upon the exercise of her discretion. The power thus conferred was a special testamentary power of appointment (Real Property Law, §§ 131, 135, 138). It was, in legal effect, a power to do what is lawful, and not what is unlawful (*Low* v. *Bankers Trust Co.,* 270 N. Y. 143, 148–149; Chaplin on Suspension of the Power of Alienation [3d ed.], § 154).

It would seem to follow that, inasmuch as Mr. Morgan had the right in 1913 to appoint the principal of these funds to Mabel and Eleanor, who were then in being, he likewise had the right, which he had reserved to himself, to confer that power on Mrs. Satterlee, and that Mrs. Satterlee was authorized and by her will could appoint the principal of these funds to Mabel and Eleanor.

The underlying principle would seem to be that, where trust property is conveyed to a trustee in trust, to receive and apply the income to a designated beneficiary for life, without making a complete and formal disposition of the trust property, thus leaving a reversion in the grantor or settlor, such grantor or settlor may, *by a subsequent deed or will,* grant or devise the trust property for two lives in being when the subsequent deed

or will goes into effect. For, under such circumstances, the grantor or settlor being the absolute owner of the reversion thus arising is free to dispose of it as he sees fit (*New York Life Ins. & Trust Co.* v. *Cary*, 191 N. Y. 33, 38–39, 41–42; *New York Trust Co.* v. *Weaver*, 298 N. Y. 1, 10–11; Chaplin on Suspension of the Power of Alienation, § 139). " Thus, for example, if the original owner creates an express trust which suspends the power of alienation for two lives in being, retaining the reversion, he may subsequently, and as a *separate transaction*, dispose of the reversion upon a like express trust for two *other* lives in being ". (Chaplin on Suspension of the Power of Alienation, § 139, p. 117, citing *New York Life Ins. & Trust Co.* v. *Cary*, *supra.*)

Moreover, in determining whether there has been an unlawful suspension of the power of alienation, the original trust instrument and the subsequent deed or will, being independent instruments, differing essentially in character and purpose, must be construed separately, and not read together (*New York Life Ins. & Trust Co.* v. *Cary*, *supra*; *New York Trust Co.* v. *Weaver*, *supra*).

As the court observed in the leading *Cary* case (*supra*, p. 39) we would " disregard a sound principle of construction if we held that two instruments not necessarily connected must be read together with the result that their provisions become invalid, where there is no question of their validity if the instruments be considered separate and apart from one another. This would amount to nothing less than construction for the sake of destruction."

Undoubtedly, the *Cary* decision offers " a loophole for evasion " (1 Bogert on Trusts and Trustees, § 219, p. 694, note 85). That circumstance, however, was not overlooked by the court in the *Cary* case; for the opinion " freely concedes " that the rule would permit the settlor or grantor of a trust to suspend the absolute ownership of trust property for more than two lives in being " by means of different instruments "; but this result, the court added, " is by no means so alarming in contemplation as counsel seems to apprehend.". (*New York Life Ins. & Trust Co.* v. *Cary*, *supra*, p. 42.)

Finally, the test of whether there has been an unlawful suspension of the power of alienation of real or personal property is whether there are " persons in being " who can give a perfect title (*Williams* v. *Montgomery*, 148 N. Y. 519, 526, *supra*; Real Property Law, § 42). If there are persons in being who, among them, have absolute ownership and can, by uniting, transfer the

property and free it from the trust, the statute is inapplicable (*Williams* v. *Montgomery, supra*; *Epstein* v. *Werbelovsky,* 193 App. Div. 428, 432, affd. 233 N. Y. 525). Applying this well-settled principle, it would seem that, since between the execution of the trust instrument in 1901 and the execution of the Morgan will in 1913, there were always persons in being (that is, Mr. Morgan and Mrs. Satterlee) who, between them, had absolute ownership and could, by uniting, give a perfect title, there was never any unlawful suspension of the right of alienation.

Nor is section 178 of the Real Property Law applicable under the circumstances; for the power of alienation was never suspended by any instrument " in execution of a power " created by the trust instrument, but in execution of an *inherent* right or power in the owner to dispose of property still vested in him and of which he was the absolute owner (Chaplin on Express Trusts and Powers, § 684; Chaplin on Suspension of the Power of Alienation, § 363). Hence, the period of suspension commences, not upon the creation of the trust, but upon the expiration of the power, usually at the death of the settlor or grantor (*City Bank Farmers Trust Co.* v. *Cannon,* 291 N. Y. 125, 133; Personal Property Law, § 11; Real Property Law, § 42).

As for *Genet* v. *Hunt* (113 N. Y. 159), upon which counsel for Mabel and Eleanor rely, it suffices to say that the case is distinguishable (see *New York Life Ins. & Trust Co.* v. *Cary, supra,* pp. 40–41, and *Farmers Loan & Trust Co.* v. *Kip,* 192 N. Y. 266, 280–281).

I may add that in reaching my decision, I have not considered the items in the stipulation and the exhibits therein to which counsel for Eleanor objects; nor have I considered the so-called 1947 instrument made by Eleanor. I have confined myself to the provisions of the declaration of trust, the will of Mr. Morgan and the will of Mrs. Satterlee, together with the conceded facts and circumstances surrounding the execution of these instruments. The objections may, therefore, be deemed to have been sustained and the challenged items and exhibits stricken.

It is accordingly directed that the 1901 trust fund herein accounted for be paid to Leonhard A. Keyes, Mabel S. Ingalls and J. P. Morgan, Inc., as trustees under the will of Louisa P. Satterlee, to be administered as directed by article III of Mrs. Satterlee's will. Settle judgment in accordance with this decision on or before June 30, 1950. Findings of fact and conclusions of law will not be required.